368 So.2d 1210 (1979)
SAVE OUR WETLANDS, INC. (SOWL) and Neal Foy,
v.
ORLEANS LEVEE BOARD and Guy LeMieux as President of the Orleans Levee Board.
No. 9812.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 1979.
*1211 Philip R. Johnson, Metairie, for Save Our Wetlands, Inc. et al., appellant.
Richard J. McGinity, McGinity & McGinity, New Orleans, for Orleans Levee Board et al., defendants-appellees.
Trudy H. Oppenheim, Trudy H. Oppenheim, P.C., New Orleans, for Pilot's Association of Greater New Orleans, intervenors-appellees.
Before SAMUEL, STOULIG and BOUTALL, JJ.
BOUTALL, Judge.
This is a suit for injunctive relief to prohibit expansion of the New Orleans Lakefront Airport by use of the water bottom of the adjoining Lake Pontchartrain.
Save Our Wetlands, Inc. (Sowl) and Neal Foy brought suit against the Orleans Levee Board and Guy LeMieux as its President contending that the expansion violated Louisiana Revised Statute 38:1235.2(B) which prohibits any construction beyond a "front line of development" where such a front line has been established and also violated Article 9, § 3 of the Louisiana Constitution of 1974 prohibiting alienation of the bed of a navigable water body. The Pilots Association of Greater New Orleans intervened in the suit on the side of defendants. Defendants then filed a motion for summary judgment which was maintained dismissing the suit. Plaintiffs appeal from this dismissal.
Appellants correctly point out that a motion for summary judgment should be maintained only if the pleadings and other evidence show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. Code of Civil Procedure Article 966. We find, however, no issue of material fact in this case and agree with the trial judge that the defendants are entitled to judgment as a matter of law.
As to the first contention, R.S. 38:1235.2(B) reads in part as follows:
"* * * * However, when the board has established and located the front line of the development in the bed of Lake Pontchartrain, including the line or location of piers, breakwaters, or other like extensions, and has sold, leased, or otherwise disposed of any land or granted any rights based upon the line or location, or when any party, for a valuable consideration, has acquired rights based upon the line or location, then no further reclamation shall be made or other works constructed by the board beyond the established front line or location in the bed of the lake, and the state of Louisiana shall not itself undertake, authorize, or permit the board or any other governmental agency or any person, association, firm or corporation whatsoever to reclaim the bed of the lake or any part thereof, or to construct any works thereon within three miles of the front line location as made by the board."
The trial judge summarized this issue in his written reasons for judgment and we hereby adopt it in part as our own:
"* * * * This `front line of development' theory was formerly part of the 1921 Constitution, and is now R.S. 38:1235.2 (as amended). One must go back to the time when this front line of development was originated, to then and there determine why it was presented, before one can answer the question: is this expansion a violation of the front line of development?
"Large portions of the Pontchartrain Lake front were, by the Levee Board, reclaimed, filled in. That reclaimed land was then sold to individuals, thousands of them, for residential purposes primarily. Persons who bought these lots paid good, prime prices for them only because they were choice sites on `the' lakefront. The public, the people who bid in on and bought these sites obviously did not wish to be `sandbagged.' They needed assurances that when they bought and paid for their land, and built their homes on it, they would remain on the lakefront. There had to be some way of preventing the Levee Board from later on filling in another three or four blocks of the lake and selling that reclaimed land as prime *1212 lakefront sites at prime prices. People who relied on the integrity, etc. of the state or its agency, the Levee Board, had to be sure that their lakefront homes did not end up blocks away from the lakefront. So there was presented the front line of development, to be established by the Levee Board, and once that line was established, there could be no further extension of any development out into the lake.
"It is admitted by both the plaintiffs and the defendants, and the Court itself readily recognizes that from the point where the former New Basin Canal was located, as Westend, to the Industrial Canal, the front line of development has been established. Lakeshore Drive, a public street, is all that separates the development in that area from the lake. The seawall has been constructed and that seawall is the front line of development. There can be no further reclaiming of the bottom of Lake Pontchartrain beyond that point. That takes care of the area west of the Industrial Canal, and that really is not at issue in this case. What is at issue in this case is: (1) has a front line of development been established by the Levee Board (which has the exclusive right to so establish), east of the Industrial Canal, and (2) if the front line of development has been established east of the Industrial Canal, where it is located?
"For the sake of argument, and in disposing of this lawsuit, it may be conceded, and is, that the New Orleans Lakefront Airport in the immediate vicinity east of the Industrial Canal separates east and west lakefront property.
"It is the plaintiff's position that the front line of development has in fact been established east of the Industrial Canal, both by the operation of the airport and by the leasing of camp sites in the waters of Lake Pontchartrain. Plaintiffs argue that the Levee Board's airport facilities fixed the front line of development for the airport. This argument is further bolstered by showing the year in and year out, for many, many years, leasing of camp sites in the Milneburg area. More particularly, they cite the leases by the Levee Board to the old Lincoln Beach and the lease to McGovern for marina purposes. They (plaintiffs) hold these leases together with the airport itself constitute the front line of development. With these arguments, the Court cannot agree, for the following reasons:
"First, the Court specifically does not establish the front line of development east of the Industrial Canal. The arguments of the plaintiffs are a pursuance in trying to show that `a' front line of development has been in fact established by virtue of the activity itself (airport operation and leasing) and not necessarily the location of said line of development.
"The plaintiffs' argument overlooks several material factors, not the least of which are:
"(1) The Orleans Levee Board itself, by law, has the exclusive right to determine or to locate the front line of development.
"(2) Development West of the Industrial Canal is far and away greater, and more extensive and more complete than it has been east of that Canal. West of the Industrial Canal, the Levee Board has indeed de facto and de jure established the front line of development. East of the Industrial Canal, the situation (development) is essentially exactly as it was when the Levee Board was given, by law, the right to establish a front line.
"(3) This is not a situation in which the Levee Board did something mistakenly, and now wishes to avoid the consequences. On the contrary, the Levee Board has guarded its right to establish the front line of development. It has been mindful of this, and has taken care to see to it that whatever it did, in its leases could not and was not to be interpreted as establishing the front line. The McGovern and Lincoln Beach leases specifically state that the improvements contemplated under them do not establish the front line of development.
"The camp sites in Milneburg, east of the airport, are not occupied on any lease *1213 right or leasehold. They are there from year to year on a permit basis, which permit can be cancelled at any time upon 90 days notice. This is done, because the Levee Board retained the right to some day establish a front line of development and it did not wish to have those camp sites then interfere with its plans for development.
"(4) The Levee Board, when it established the front line west of the Industrial Canal, did so formally and in so many words, declared that `this' is the front line. It left nothing for speculation or conjecture. Whenever it did anything east of the Industrial Canal, it took care to formally express, in writing, that what was being done did not constitute establishment of a front line. There has been no formal or even tacit establishment of a front line to the east. That has been jealously and cautiously avoided.
"(5) There is nothing in the old (1921) Constitution or in the revised statutes that places any time limitation on when the front line is to be established. Nor are there any provisions therein which state that the airport as formerly constituted could not be modernized or expanded, that in its former confines it established a front line of development in that area." * * * * *
For these reasons, we agree with the trial judge that a front line of development has not been established and that no violation of the statute is present in this case.
Appellants' second contention is that the actions of defendants violate Article 9, § 3 of The Louisiana Constitution of 1974 which provides as follows:
"The legislature shall neither alienate nor authorize the alienation of the bed of a navigable water body, except for purposes of reclamation by the riparian owner to recover land lost through erosion. This Section shall not prevent the leasing of state lands or water bottoms for mineral or other purposes. Except as provided in this Section, the bed of a navigable water body may be reclaimed only for public use."
We think that the last sentence of this section controls in this case. The operation of an airport for the benefit of the public is clearly public use. Further, it is clear that the State's actions do not constitute alienation, but rather reclamation. Alienation is defined in Black's Law Dictionary, Fourth Edition, page 96 as follows:
"* * * * the transfer of the property and possession of lands, tenements, or other things, from one person to another."
Alienate is defined as:
"To convey; to transfer the title to property."
Thus, we see that the key element is the transfer of title.
Reclaim, on the other hand is defined by Black at page 1435 as:
"To claim or demand back; to ask for the return or restoration of a thing; to insist upon one's right to recover that which was one's own, * * *"
The State is, in this case, only reclaiming through a State agency a waterbottom which it already owns. See Revised Statute 38:1235.1. We therefore reject the contention that this portion of the project violates the Constitution of this State; on the contrary, it is specifically authorized by Article 9 § 3.
We find that only questions of law are presented by this lawsuit. Since no material facts are at issue and defendants are entitled to judgment as a matter of law, the dismissal of this suit by summary judgment was proper under our law.
Appellants' second assignment of error argues that the Constitutional issue raised by supplemental petition presented a justiciable controversy and rendered summary judgment improper. Appellants did file a supplemental petition in the trial court, asking that a declaratory judgment in favor of appellants be entered in addition to the injunctive relief originally prayed for. The trial judge apparently felt that since this suit dealt with only phase one of the entire project, specifically the extension of the *1214 runway,[1] and since the Constitutional prohibition against alienation did not apply that there was no reason to decide the prayer for declaratory relief separately from the other issues. Further, when this suit was filed the reclamation was per se complete. To require its removal would compound any harm, assuming any was done.
For all of the above reasons, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] The trial judge specifically stated in his reasons for judgment that later phases in the overall program would have to be decided in a separate suit. Future phases call for the building of Marinas, Hotels, Restaurants, and other structures.